## IN RE FIGUEROA MAESTRE, RESPONDENT.

## COMPLAINT by the Attorney General of Porto Rico for the disbarment of the respondent.

### No. 8.—Decided May 8, 1914.

DISBARMENT—REFEREE TO TAKE EVIDENCE.—The *fiscal* having moved for the appointment of a referee to take the evidence in this case and the respondent having made no objection, the court made the appointment.

ID.—ATTORNEY-AT-LAW—ACTS FOR WHICH AN ATTORNEY MAY BE DISBARRED.— After considering the evidence introduced in this case it was held that the following facts, which are sufficient to justify the disbarment of the respondent, had been fully proved:

1. That the respondent, without the consent of his client, the plaintiff, compromised an action for damages and received from the defendants the sum of $150 in settlement, which amount he appropriated to his own use, refusing to· deliver to his client the half of the same, which was the amount belonging to the client under his agreement with the attorney, the said compromise serving as a basis for the judgment rendered by the lower court against the defendants for the said amount.

2. That the respondent having agreed with a client to bring an action for divorce, he advised his client to convey his property to a third person, assuring him that the said property would be returned to him after the divorce was obtained and upon the payment of his attorney's fees; that on several occasions the respondent endeavored to secure the signature of the wife of his client in order to convey the said property, but she always refused, and for the purpose of recovering his fees the respondent caused his client to sign a promissory note for the sum of $141.66 in favor of a third person, the said promissory note being in the handwriting of the respondent and the signature to the said note being acknowledged by his client before the respondent himself in his capacity of notary public; that the promissory note was endorsed to a third person who, following a form prepared by the respondent, filed a complaint for the recovery of the amount of said note against the respondent's client and attached the property; that the writ of attachment was drawn up by the respondent himself and he accompanied the marshal to the property to levy the attachment, which was suspended at the instance of the said respondent; that then the respondent went to his client's house and induced him and his wife to sign a deed by making them believe that it was a document for the release of the attachment when in point of fact it was a deed for the sale of the property to the holder of the promissory note for the sum of $400, which neither his client nor the latter's wife ever received; that subsequently the respondent exchanged the said property for an automobile valued at $300 and afterwards exchanged the automobile for a pair of horses which he sold later to another person.

The facts are stated in the opinion.

*Messrs. Wolcott H. Pitkin, Jr., Attorney General of Porto*

*Rico,* and *Charles E. Foote, Fiscal of the Supreme Court,* for The People.

*Messrs. Jacinto Texidor* and *Manuel Benítez Flores* for the respondent.

*Mr. Martín Travieso, Jr.,* referee appointed by the court.

MR. JUSTICE WOLF delivered the opinion of the court.

The Attorney General of Porto Rico appeared and asked that Attorney Francisco Figueroa Maestre be disbarred from practice because of the two following charges:

"First. That the accused, being attorney for Ceferino Bonhome as plaintiff in an action for damages against Francisco Alamo, Carmelo Rodríguez and Eusebio Villegas, compromised the said action with defendants Rodríguez and Villegas, by virtue of which compromise the District Court of San Juan rendered judgment that said defendants pay to said plaintiff the sum of $132.52; that defendants Rodríguez and Villegas paid to the accused, as attorney for the plaintiff, the sum of $150 in full payment and satisfaction of the judgment rendered against them; that on three different occasions the plaintiff, Ceferino Bonhome, demanded of the accused his corresponding share of the said amount so received by the accused, but the accused denied positively that he had received any sum and threatened Bonhome to hale him before the courts if he persisted in his demand.

"Second. That in January of 1913 the accused conspired, combined and agreed with Francisco des Choudens· and Carlos Nieves to swindle and defraud Carolina Hernández, the wife of one Leocadio Pintado, who had engaged the accused to bring an action for divorce against his wife; that with the object of depriving Carolina Hernández of her half of the ganancial property the accused advised Leocadio Pintado to transfer his property before bringing the action for divorce in order to avoid giving anything to his wife; that the accused was to receive $141.66 for his services; that Pintado having agreed to the combination, he signed a promissory note for $141.66 payable to Carlos Nieves on December 31, 1912, the note being dated January 10, 1912; that in order to be able to bring an action and attach the property without giving bond, on February 6, 1913, after the note was due, Leocadio Pintado, following the instructions of the accused, acknowledged the authenticity of his signature to the note before the accused in his character of notary public; that on the day following, February 7, 1913, Carlos Nieves endorsed the note to

Francisco des Choudens who filed an action for the recovery of the amount thereof on the same day and petitioned for an attachment of the property to secure the effectiveness of the judgment.

"That, the writ of attachment having been issued, the accused, as attorney for Francisco des Choudens, requested the marshal to go with him to levy the attachment; that the marshal and the accused went upon the property of Pintado and began steps for executing the writ, but they were suspended by order of the accused who invited Pintado and his wife to call at his office on the following day to suspend and settle the attachment; that said Pintado and his wife went to the office of the accused who, while leading them to believe that they were signing a document for the dissolution of the attachment, made them sign a deed executed before him as a notary public and by which they sold the property to Francisco des Choudens; finally, that the property having been so sold, the accused offered to sell it to Bartolomé Joy who accepted, offering in exchange an automobile valued at $300. This the accused accepted and thus Pintado and his wife were despoiled of their property."

The said attorney was duly cited to appear on June 9, 1913, at which time he filed demurrers which were overruled. Previous thereto, namely, on June 6, 1913, the *fiscal* of this court filed a motion asking that, on account of the great number of the witnesses, the case be sent to a referee. Upon the overruling of the demurrers and the respondent making no further answer or objection or opposing the reference, the case was referred to Martín Travieso, an attorney of this court, to hear the proof that might be had on both sides and to remit and report the same to this court together with his conclusions thereon.

After a number of unavoidable delays the report of the referee was filed in this court and after due time for the presentation of briefs the case was finally submitted for our consideration.

The record shows that besides the oral and documentary proof presented to the referee the parties also submitted briefs at the hearing.

The report of the referee found, with respect to the first charge, that Ceferino Bonhome employed the respondent to

bring a suit for damages against Rodríguez, Villegas and Alamo for injuries that Bonhome suffered in one of the launches of these men, agreeing to pay the respondent as fees 50 per cent of the amount so recovered; that the said respondent brought a suit in the Municipal Court of Bayamón in the name of Bonhome against Rodríguez, Villegas and Alamo; that the trial of this case took place before the municipal court, without the presence of the complainant and without any witnesses in his favor. Wherefore judgment was rendered against him and from that judgment the said Figueroa Maestre, in the name of the complainant Bonhome, appealed to the District Court of San Juan, asking for an attachment against the launches of the defendants, although he knew that he had no proof to support the complaint; that after the case was set for hearing in the district court, the respondent began negotiations with two of the partners of the defendant firm, Villegas and Rodríguez, for the purpose of obtaining a compromise of the pending suit; that having obtained such compromise, the defendants, Villegas and Rodríguez, on March 10, 1912, in a writing executed before Notary Artemio P. Rodríguez, agreed that judgment should be rendered against them for two-thirds of the amount claimed, namely, for $132.52; that this compromise was made by the respondent without the previous consent of his client; that in payment of the two-thirds of the amount claimed, for which the consent judgment was entered, and for the costs, the defendants, Villegas and Rodríguez, turned over to the respondent, and he received the sum of $150, for which the respondent delivered to them a receipt signed by himself, the payment of the money and the execution of the receipt having taken place on the same day on which the compromise was signed, namely, March 10, 1912, at the house of Carmelo Rodríguez and after the notary who authenticated the compromise had gone; that on the day after the compromise and the payment of the sum agreed upon therein, the District Court of San Juan rendered judgment against

Villegas and Rodríguez for $132.52 and dismissed the complaint with regard to the other defendant, Alamo; that the respondent was requested several times by his client, Ceferino Bonhome, to pay him the half that belonged to him, namely, $75, and that the respondent refused to do so, asserting that he had received nothing at all and answering, upon being questioned as to the receipt that he had given, that such receipt was a false document.

We have examined carefully the evidence taken and, in our opinion, it sustains the foregoing conclusions of the referee except as regards the attachment of the launches, which was asked for undoubtedly in the municipal court instead of in the district court. This detail is of no importance, in our opinion, for the purposes of weighing the charge against the respondent.

The referee in his conclusions draws no particular inference from the fact that the respondent at the close of the hearing delivered $75 to the referee to be turned over to his client, Ceferino Bonhome, but the referee, nevertheless, concluded that the first charge had been fully proved.

The respondent does not deny that he executed the receipt or that judgment was rendered in favor of his client, but he maintains that this receipt was a fictitious arrangement made between himself and Rodríguez and Villegas in order to save harmless the sureties on the attachment bond, the respondent being personally responsible to such sureties. To us, as to the referee, it is difficult to understand why such an indirect method was necessary when a simple agreement to dismiss without costs or some other agreement would have sufficed. In view of the judgment and the receipt, the burden was cast upon the respondent to explain the existence of such judgment and receipt. His own statement, without satisfactory corroboration, is too improbable to convince us. Even on his own theory there was no necessity for a receipt. The respondent maintains that he made the complicated arrangement as finally consummated, with the consent and ap-

proval of his client, but his client tells a different story which in the main has no inherent improbability and is supported by the rest of the proof. Villegas and Rodríguez, it is maintained by the respondent, each contradicts himself in the testimony and they each contradict the other, but although there are inconsistencies in their testimony as to times and places and manner of payment, they are perfectly clear and satisfactory on the main point, namely, that they paid the respondent the sum of $150 in settlement of the claim of his client against them. To suppose the fact to be otherwise than as shown by the proof of the Government, one would have to suppose that Bonhome, Villegas and Rodríguez deliberately combined and conspired to injure the respondent. Such a theory is not even maintained by the respondent, although he attacks the veracity of these witnesses. Absolutely no motive was shown for such a conspiracy, and this is more significant in the case of witnesses Villegas and Rodríguez. Furthermore, we cannot close our eyes to the fact that the respondent delivered $75 to the referee to be turned over to Bonhome. We cannot follow the respondent when he maintains that the delivery of this money was an act of mere magnanimity.

With respect to the second charge the referee found:

"1. That Leocadio Pintado, the owner of a property of 7½ *cuerdas* in the ward of Cerro Gordo, solicited the services of the respondent to settle a question pending with a neighbor regarding boundary lines and at the same time to divorce him from his wife, Carolina Hernández. The question concerning the boundary lines was settled amicably.

"2. That with regard to the divorce of Pintado, the respondent advised him to convey his property to a third party until the question of the divorce should be settled, when the property would be returned to him upon his paying to the respondent the fees agreed upon, amounting to a third part of the value of the property.

"3. That for the purpose of securing the signature of Carolina Hernández which was necessary for the conveyance of the property of Pintado, the respondent went to the house of Carolina Hernández

two or three times and asked her to sign, telling her once that it was for the divorce and at another time that it was for the sale of the property, and that Carolina Hernández refused to sign, saying that the property was all she had with which to support her four children and she did not want to sell it.

"4. That for the purpose of collecting his fees and consummating the conveyance of the property, as he had advised Pintado, the respondent caused Pintado to sign a promissory note for the sum of $141.66 in favor of Carlos Nieves, whom Pintado did not know and to whom he owed nothing. The note was made on February 1, 1913, but was dated January 10, 1912, to fall due on January 31, 1913. The note was in the handwriting of the respondent.

"That the note was made with the object of bringing an action for its collection and attaching the property, thus securing its conveyance which he had not been able to secure before on account of the refusal of Carolina Hernández to sign any document which would deprive her of her property.

"That for the purpose of being able to secure an attachment of the property without the necessity of giving a bond, the respondent induced Pintado to acknowledge the authenticity of his signature to the fictitious note and the said acknowledgment was made before the respondent as a notary public on February 6, 1913.

"That on the following day Carlos Nieves, the payee of the note, endorsed it to Francisco des Choudens for value received and on the same day (February 7) the latter drew up a complaint for recovery on the note, following a form of complaint furnished him by the respondent. On the same day plaintiff des Choudens asked for a *lis pendens* attachment on the property of Leocadio Pintado, which was granted by the court.

"The writ issued by the court to the marshal was drawn up and written in the handwriting of the respondent who, in reply to questions of the referee, admitted that he had drawn up the said writ although he had testified previously that he had taken no part whatever in the action for the collection of the note because it was against his client, Pintado.

"5. That the respondent applied to the marshal of the Municipal Court of Bayamón and accompanied him to levy the attachment on the property of Pintado and that the service of the attachment was suspended at the instance of the respondent, whose instructions the marshal followed, notwithstanding the fact that the respondent stated that he was not plaintiff's des Choudens' attorney and had taken no part in the said suit.

"That the attachment having been suspended by order of the respondent, he advised Pintado and his wife to go to his office on the following day in order to release the attachment, which they promised to do.

"That on the following day Pintado and his wife went to the office of the respondent for the purpose of releasing the attachment and upon their arrival there the respondent produced a document and asked them to sign it; that Carolina Hernández, the wife of Pintado, signed the document presented to her by the respondent without its having been read to her and without knowing its contents, she believing that what she was signing was necessary to free her property from the attachment levied the day before; that the document so signed was in fact a deed by which Pintado and his wife sold the property to Francisco des Choudens for the sum of $400 and acknowledged having received that sum, but that in reality it was never received by the owners of the property; that Carolina Hernández never agreed to sell her property to des Choudens or to any other person.

"The referee believes that Pintado signed the deed of sale to des Choudens knowing its contents and with the intention of despoiling his wife of her share in the property, but not believing that the property would pass to des Choudens in absolute ownership.

"6. That when des Choudens had acquired the property the respondent immediately began negotiations to convey it to a third party and offered to sell it to Bartolomé Joy who agreed to accept the property in exchange for an automobile which the respondent and Joy valued at $300; that finally the property was conveyed by des Choudens to Joy in exchange for the said automobile.

"7. That des Choudens having acquired the automobile the respondent took steps to get rid of it and finally traded it to Rafael González for a span of horses and a buggy, the whole turnout being valued at $150; that the horses were sold by des Choudens to a man named Rossy for the sum of $120.

"The result of all the acts proven is that Carolina Hernández and her husband have been despoiled of their property, without the consent of the former and in violation of the agreement made with the latter to the effect that when the divorce was secured the property would be returned to him upon his paying to the respondent a third part of the value of the property as fees.

"The referee believes that the respondent is responsible for the said despoiling because all of the proceedings followed for carrying it into effect were by his advice and under his instructions."

The attorney for the respondent maintained before the referee that there was no proof that Pintado sought the services of the respondent for securing a divorce. There was the testimony of Carolina Hernández that Figueroa Maestre sought her signature to the divorce proceedings, and there is also the doubtful testimony of Pintado. Of course, these statements are denied by the respondent, but no general attention may be given to such denials, given the opinion we have formed of his testimony with regard to the facts of the first charge against him. But the question of the divorce is unimportant and we must consider that the essential nature of the second charge against the respondent is the defrauding of Carolina Hernández. It may be admitted, as the respondent contends, that Pintado really owed the respondent a certain sum for services rendered and to be rendered by the respondent to Pintado.

The respondent maintains that Pintado was anxious to sell his property in order to pay Figueroa Maestre the amount due him. So far we may follow the respondent, but at the same time the proof tends to show that Pintado thought he would get some benefit for himself as against his wife in such a sale. We may also believe that Figueroa Maestre sent Pintado to des Choudens, but from that moment on the proof is convincing that Figueroa Maestro directed and controlled all the operations. When the respondent was first questioned about the attachment executed against the lands of Pintado he denied having anything to do with it, but subsequently he admitted that he prepared the papers for des Choudens.

If Pintado really owed the respondent, as is not unlikely, the straightforward thing to have done would have been for the respondent to take a note payable to himself for the amount he owed or perhaps a mortgage, instead of which the note is antedated, and des Choudens is not even made the payee but an employe of his by the name of Nieves. All the transactions were unnecessarily complicated.

It appears absurd to the attorneys for the respondent

to suppose that the facts took place as the Government witnesses attempt to show, but it is a greater absurdity, if not humanly impossible, to follow and believe the sequence of events as outlined by the respondent.

The respondent seems to maintain that des Choudens was to buy the property of Pintado and to become the surety for the debt the said Pintado owed the respondent. To convince one's self of the absurdity of this contention one has only to read the testimony of des Choudens. The testimony of that witness showed that he only knew a few outside facts, and in his cross-examination he developed a state of mind and memory totally inconsistent with the character of surety which he was assuming. The whole proof shows that des Choudens merely stood in the place of Figueroa Maestre and acted under his orders.

The subsequent proceedings brought out the real facts perhaps more clearly. The conveyance of the land is supposed to have been made to des Choudens, yet the management and control of the respondent appear in all the succeeding transfers, namely, in the exchange of the property for the automobile and the transfer of the automobile for the buggy and horses, and the ultimate exchange for cash. It is unnecessary to rehearse all the proof. There is some conflict therein, but verity lies on the side of the Government's witnesses and not on the side of the respondent. If no fraud were being practised, there would have been no necessity for such roundabout methods to accomplish such simple objects.

The attorneys for the respondent commented on the fact that it is absurd for anyone to be so simple-minded as Carolina Hernández was in believing that by signing a simple paper she would release an attachment, but the marshal was on the community property of Pintado and his wife in the act of attaching the same. He desisted at the bidding of the respondent. She, a woman who didn't know how to write, was probably so mystified and hoodwinked by the marshal's being there and by the acts of her husband and the respond-

ent as to be willing to do anything that was required to release the property.

We see no reason in any part of the evidence to find the facts in any different manner than they were found by the referee, and having gone carefully over all the evidence, we expressly adopt his findings of fact as our own with the exception noted in discussing the first charge.

Respondent in his brief makes an attack on the conduct of the *fiscal* of this court. He maintains that said *fiscal* was his enemy, but we find nothing in the record to justify such a supposition. Respondent put the *fiscal* on the stand and so vouched for his credibility. The particular complaint is over the manner of conducting the preliminary examination of the witnesses by this official. Respondent maintains that he showed partiality in his choice of witnesses and in reducing or failing to reduce their statements to writing. Generally the election of witnesses is under the control of the *fiscal* and we see no evidence of partiality or misconduct on his part, but if there were any misconduct, it should have been brought out in a proceeding, administrative or otherwise, directed against the *fiscal*. The proof of such misconduct could not help in determining the truth of the issues joined between The People of Porto Rico and the respondent and to hear which the referee was sitting.

The respondent says that it is not for the referee to decide the case but for the court, and we agree with him. The order of reference was made without any objection on the part of the respondent, and in the said order the referee was commissioned to take the evidence which should be presented to him by both parties and to submit it to this court together with his conclusions thereon. We are not bound to follow the conclusions of the referee and if we have done so it is because the evidence amply justifies them.

These are extremely grave charges and affect the essential nature of a lawyer's relation to his client and to the public, who, by reason of the complex nature of society and

the complicated origin of some of our most cherished rights, are almost at the mercy of a body of trained experts whom the world knows as lawyers. It must be a satisfaction to society at large, and especially to the bar, that a lawyer can be depended on almost always to protect the defenseless persons with whom he has professional dealings. We could understand perhaps but not excuse an attorney who, pressed by need, indefinitely retains the money of his client, but not one who, when confronted with a demand for the delivery of such money, not only refuses to pay but tries to upbraid his client by charging him with being a perjurer and charges other witnesses with conduct that would make them perjurers and conspirators. We could understand also an attorney who, in his zeal for his client, might deceive another person or the court. Bad though the conduct of such an attorney would be he might be acting under a mistaken notion of the interest of his client; but here is an attorney who would not only deceive and defraud a defenseless woman to enrich himself, but even turns on his own client, discreditable though such client was, to trick him out of his property! Society must be protected from attorneys like the respondent, and sorry though we are for the particular person, we feel that we have no discretion in view of the facts, and both charges having been proved, the respondent must be disbarred from practice.

Attorney Figueroa Maestre is also a notary public, and in order to determine whether by the mere fact of his being disbarred as an attorney his permit to practise as a notary public is revoked also, he will be cited to appear before this court to show cause, if any he has, why he should continue to exercise the functions of a notary public notwithstanding the fact that he has been disbarred as an attorney.

*Respondent disbarred and ruled to show cause why he should not be dismissed from the notarial profession as a consequence.*

Chief Justice Hernández and Justices del Toro and Aldrey concurred.